UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PARK WEST GALLERIES, INC.,

       Plaintiff,

                                     Case No.  08-12247
v.

                                     Hon. Lawrence P. Zatkoff

GLOBAL FINE ART REGISTRY, LLC,
THERESA FRANKS, and BRUCE HOCHMAN,

       Defendants.
_____/

PARK WEST GALLERIES, INC.,

       Plaintiff,

                                       Case No.  08-12274
v.

                                     Hon. Lawrence P. Zatkoff

DAVID CHARLES PHILLIPS,

       Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the U.S. Courthouse,
in the City of Port Huron, State of Michigan,
on the 12th day of August, 2010

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

    This matter is before the Court on Plaintiff's Motion for a Judgment as a Matter of Law

and/or For New Trial ("JMOL Motion") (Docket #338).  All Defendants have filed responses, to

which Plaintiff has replied. The Court finds that the facts and legal arguments pertinent to the JMOL

Motion are thoroughly presented in the parties' papers, and the decision process will not be aided

by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the JMOL Motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Plaintiff's JMOL Motion is DENIED insofar as Plaintiff seeks a judgment as a matter of law and GRANTED IN PART and DENIED IN PART insofar as Plaintiff seeks a new trial.

## II. BACKGROUND

On March 15, 2010, the parties commenced a jury trial in this matter. Approximately six weeks later, on April 21, 2010, the jury returned a verdict on each of the 19 separate claims in this matter. The jury found in favor of Defendants Fine Art Registry, LLC ("FAR"), Bruce Hochman ("Hochman"), Theresa Franks ("Franks") and David Charles Phillips ("Phillips") with respect to each of the 12 claims of defamation, tortious interference with business expectancies and conspiracy to tortiously interfere with business expectancies asserted by Plaintiff. In addition, the jury found in favor of Plaintiff with respect to the six counter-claims filed against Plaintiff by FAR and Phillips for defamation, tortious interference with business expectancies and conspiracy to tortiously interfere with business expectancies. Finally, the jury found in favor of FAR, and awarded FAR $500,000 in damages, on FAR's counter-claim against Plaintiff for violation of the Lanham Act, 15 U.S.C. § 1125(d).

Plaintiff timely filed the instant motion seeking the following post-trial relief:

> 1. Plaintiff asks this Court to set aside the jury's verdict and enter judgment in favor of Plaintiff on its defamation claims against Franks and FAR premised on statements asserting that Park West was a "criminal" or was "involved in organized crime."

2. Plaintiff requests that this Court enter judgment in its favor on FAR's counter-claim for violation of the Lanham Act.

3. In addition (and in the alternative, should this Court not enter judgment as requested above), Plaintiff asks for a new trial on each of the following 13 claims: (a) Plaintiff's defamation claims against Franks, FAR, Phillips, and Hochman; (b) Plaintiff's claims of tortious interference with business expectancies against Franks, FAR, Phillips, and Hochman; (c) Plaintiff's claims for conspiracy to tortiously interfere with business expectancies against Franks, FAR, Phillips, and Hochman; and (d) FAR's counter-claim against Plaintiff for violation of the Lanham Act.

Plaintiff specifically states that it does not seek a new trial as to the remaining six counter-claims against Plaintiff filed by FAR and Phillips. The jury found in favor of Plaintiff on each of those six counter-claims, and no post-trial motion has been filed with respect to those six counter-claims.

## III. LEGAL STANDARD

### A. Judgment as a Matter of Law

Judgment as a matter of law is appropriate where, after a party has been fully heard on an issue, there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 236 (6th Cir. 2003). When reviewing a motion for judgment as a matter of law based on insufficiency of the evidence, the court should not "weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). Rather, the court "views the evidence in a light most favorable to the party against whom the motion is made and gives that party the benefit of all reasonable inferences." *Id.* The motion should be granted "only if a complete absence of proof exists on a material issue in the action, or

if no disputed issue of fact exists upon which reasonable minds could differ." *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426-27 (6th Cir. 2004) (quoting *LaPerrier v. Int'l Union UAW*, 348 F.3d 127, 132 (6th Cir. 2003)). Judgment as a matter of law must be entered for the moving party, however, "if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in the favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).

**B.     New Trial**

Pursuant to Federal Rule of Civil Procedure 59(a), a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). The Sixth Circuit interprets this to mean that a new trial is warranted when a jury has reached a "seriously erroneous result" as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias. *Holmes v. City of Massillon,* 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citations omitted). However, a Court cannot grant a new trial simply because it would have reached a different conclusion than the jury. *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2000).

### IV.  MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff asserts that it is entitled to judgment as a matter of law on: (1) certain of the allegedly defamatory statements that formed the basis of Plaintiff's defamation claims against FAR and Franks, and (2) FAR's Lanham Act counter-claim. Plaintiff relies on two separate legal

theories:

(a) the absence of evidence from which a jury could reasonably conclude that the defamatory statements were true, and (b) the "contumacious conduct" of Franks and counsel for FAR, Franks and Phillips (collectively, "the FAR Defendants").

## A.    Sufficiency of the Evidence

As the FAR Defendants and Hochman argue, however, Plaintiff is procedurally barred from pursuing a judgment as a matter of law.  In this case, Plaintiff failed to move for judgment as a matter of law before the case was submitted to the jury, as Fed. R. Civ. P. 50(a)(2) requires:  "a party who has failed to move for a directed verdict at the close of all the evidence[] can neither ask the district court to rule on the legal sufficiency of the evidence supporting a verdict for his opponent nor raise the question on appeal." *Portage II v. Bryant Petroleum Corp*., 899 F.2d 1514, 1522 (6th Cir. 1990) (citing *Southern Ry. Co. v. Miller*, 285 F.2d 202, 206 (6th Cir. 1960)). The rule applies whether the basis for challenging the legal sufficiency of the evidence is a motion for a new trial or a motion for a judgment as a matter of law. *Southern Ry. Co.*, 285 F.2d at 206 (finding that "[n]o motion for directed verdict having been made, the question of the sufficiency of the evidence to support the jury's verdict is not available as a ground for a motion for new trial").

Plaintiff argues that it did not have to move for judgment as a matter of law prior to submission of the case to the jury because its "decision not to file a written JMOL motion during trial was made in reliance on the Court's March 29, 2010 statement that it was considering striking the Defendants' pleadings and entering a default judgment, as well as on the Court's April 9, 2010 reiteration that it was considering entering judgment against the defendants."  Plaintiff thus "believed that these statements by the Court preserved its right to file a post-trial Rule 50(b) motion

challenging the failure of proof on these claims." In support of that contention, Plaintiff relies on a number of non-binding, non-analogous and otherwise unpersuasive cases.[1] To the extent that Plaintiff relied on the Court's statements that "the Court" might enter judgment against Defendants as a basis to relieve Plaintiff of its procedural obligations, Plaintiff's reliance was misguided. Each party is responsible for trying its own case. And, although this Court is the appropriate medium in which to try the case, the statements of the undersigned are not a voice or advocate for either party. In other words, each party must try her/his/its own case in accordance with established rules of civil procedure and evidence, as well as in compliance with the orders of the Court. In this instance, Plaintiff failed to comply with the requirements of Rule 50(b) and, as a result, Plaintiff is procedurally barred from obtaining a post-trial judgment as a matter of law with respect to any of its claims (or part thereof) and any counter-claims filed against it.[2]

## B. Contumacious Conduct

The U.S. Supreme Court has held that "[t]he inherent powers of federal courts are those which 'are necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)). The exercise of such powers

---

[1] *See Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 755 (E.D. Va. 2009) (Fourth Circuit recognizes "substantial compliance" where "both the adverse party and the court are aware that the movant continues to believe that the evidence presented does not present an issue for the jury"); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007) ("technical noncompliance" with Rule 50(a) motion may be excused where the purposes of the rule are otherwise satisfied); *Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp.*, 729 F.Supp.1488, 1502 (D.N.J. 1990) ("substantial compliance").

[2] Plaintiff also argues that the Court "may still grant a Rule 50(b) motion[,] even where no Rule 50(a) motion was filed, if there is plain error that would otherwise result in a manifest miscarriage of justice." *See, e.g., American Nat'l Fire Ins. Co. v. Mirasco, Inc.,* 451 F. Supp. 2d 576, 580-81 (S.D.N.Y. 2006); *Broadnax v. New Haven*, 415 F.3d 265, 268 (2nd Cir. 2005); *Cretella*, 640 F.Supp.2d at 755 ("manifest injustice would otherwise occur since the verdict is wholly without legal support"); *Densberger v. United Techs. Corp.,* 125 F. Supp. 2d 585, 590 (D. Conn. 2000); *BE & K Constr. Co. v. United Broth. of Carpenters & Joiners, AFL-CIO,* 90 F.3d 1318, 1325 (8th Cir. 1996) ("where not allowing such claims would constitute plain error resulting in a manifest miscarriage of justice").

is critical to the Court's ability to "protect . . . the due and orderly administration of justice and . . . maintain[ ] the authority and dignity of the court." *Id.* (citation omitted). Importantly, however, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Id.*

Plaintiff argues that this Court should vacate the jury verdict and enter judgment in favor of Plaintiff on its defamation claims against Franks and FAR and on FAR's Lanham Act claim based on the "contumacious conduct" of Franks and counsel for the FAR Defendants. The U.S. Supreme Court and the Sixth Circuit have held that dismissal of an action may be appropriate in cases involving such conduct or other flagrant abuses. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) (dismissal is a proper sanction for the misconduct of counsel without regard to the asserted innocence of the client); *Consolidation Coal Co. v. Gooding*, 703 F.2d 230, 233 (6th Cir. 1983); *Reid v. Prentice-Hall, Inc.*, 261 F.2d 700, 701 (6th Cir. 1958).

As set forth in detail in Section V below, the Court finds that Franks and counsel for the FAR Defendants engaged in persistent misconduct in front of the jury throughout the trial, and it would be fair to characterize the misconduct as "contumacious conduct." As explained below, the Court also concludes that their misconduct permeated the trial and justifies ordering a new trial against the FAR Defendants. The Court is not, however, persuaded that their misconduct warrants vacating the jury verdict and entry of judgment against any party. As the multiple warnings to Franks and counsel for the FAR Defendants (but the absence of imposing consequences that would hinder their ability to try the case) during the course of trial suggest, the Court is reluctant to take a case out of the hands of a jury and substitute its will. For those reasons, the Court allowed the case to be tried in its entirety, in spite of the misconduct by Franks and counsel for the FAR Defendants. For the

same reasons, the Court will not enter judgment against Franks or FAR.

**C.      Conclusion**

For the reasons set forth in Sections IV.B. and IV.C., the Court denies Plaintiff's motion for a judgment as a matter of law.

# V.  MOTION FOR A NEW TRIAL

Plaintiff next moves the Court to order a new trial on all twelve of Plaintiff's claims, as well as a new trial on FAR's Lanham Act claim.   Plaintiff bases its motion for a new trial on the pervasive misconduct of Franks, Hochman and defense counsel - misconduct Plaintiff asserts arises from willful disregard of the Court's orders.   The FAR Defendants have responded that "[a]lthough there were a few insignificant violations of this [C]ourt's limine orders by defense counsel and/or a couple of their witnesses, these were corrected by the [C]ourt and/or there was no objection by counsel.   Additionally, there were repeated violations of the limine orders by counsel for Plaintiff." Hochman states that "the 17 alleged instances of misconduct in this case do not warrant a new trial." Hochman also  contends that "of these 17 alleged instances that purportedly form the basis of Plaintiff's motion for a new trial against Hochman, 15 have nothing to do with him, or his counsel, and the two that relate in any way do not violate any Court orders, nor are they otherwise improper."

**A.      Applicable Law**

In order to grant a new trial based on attorney and/or party misconduct, a district court must find that there is a "reasonable probability that the verdict of a jury has been influenced by such conduct." *Twachtman v. Connelly*, 106 F.2d 501, 509 (6th Cir. 1939). *See also Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) ("Counsel should not introduce extraneous

matters before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects, and, where there is a reasonable probability that the verdict has been influenced by such conduct, it should be set aside.").

> In determining whether "there is a reasonable probability that the verdict of a jury has been influenced" by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e. g. whether it is a close case), and the verdict itself.

*Peter Kiewit*, 624 F.2d at 756. A "party seeking a new trial [based on attorney misconduct] must make a concrete showing that the misconduct of counsel consistently permeated the entire trial from beginning to end," *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir.1997) **(citation omitted).**

**"Although comments may be inappropriate, the objecting party must demonstrate that it was**

**unfairly prejudiced by the comments." *Chirco v. Charter Oak Homes, Inc.*, Case No. 01-71403, 2008 WL 1743343 at \*6 (E.D. Mich. Apr. 11, 2008) (citing *In re Air Crash Disaster*, 86 F.3d 498, 525 (6th Cir. 1996)). "The burden of showing harmful prejudice rests on the party seeking a new trial and it is a heavy burden." *Shabazz v. Martin*, Case No. 07-73005, 2007 WL 2782054 at \*1 (E.D. Mich. Sept. 24, 2007) (citing *Peter Kiewit*, 624 F. 2d at 756 and *In re Air Crash Disaster*, 86 F.3d at 526). "If a verdict is challenged on the basis of prejudice, the claim of prejudice must be evaluated in the 'context of the entire record' and in view of any curative instructions given by the court." *Patterson v. Winfrey*, Case No. 05-71528, 2010 WL 726742 at \*2 (E.D. Mich. Feb. 24, 2010). "A lawyer's comments usually will not be cause for reversal [on**

appeal] unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial jury . . . [or] counsel's remarks were such as to deflect the jury's attention from the issues involved and had a controlling influence upon the verdict." *Wilson v. General Motors Corp*., 183 Mich. App. 21, 26 (1990) (citing *Guider v Smith*, 157 Mich. App. 92, 101(1987), *aff'd* 431 Mich. 559 (1988)).

**B.     The Misconduct During the Cases-in-Chief**

In its brief, Plaintiff sets forth what it considered the 17 most egregious, but not the only, examples of misconduct by Franks, Hochman and defense counsel during the presentation of the cases-in-chief of Plaintiff, on the one hand, and FAR and Phillips, on the other hand.  As the parties have done, the Court addresses each instance in turn.

*1.     March 16, 2010 - Reference to Criminal Investigations*

While questioning Morris Shapiro ("Shapiro") on cross-examination, Donald Payton ("Payton"), lead counsel for the FAR Defendants, asked: "She didn't tell you she was from the FBI?"  The Court sustained Plaintiff's timely objection.  As the Court stated on the record after the jury had been dismissed for the day, Payton's question contravened the Court's motion in limine ruling regarding law enforcement investigations ("I previously ruled that investigations by any law enforcement agencies are not admissible").  At that time (the end of the second of twenty-eight days of trial), the Court cautioned: "I am not going to touch on this subject again except to say that if it's brought up in this forum or any other forum[,] there are going to be some serious consequences."

*2.     March 17, 2010 - Reference to Other Legal Disputes Involving Plaintiff*

On his continued cross-examination of Shapiro, Payton asked the following two

questions: "Do you know about any controversy with Mr. Benfield and forged signatures in his art work at Park West?" and "Do you know whether or not Park West settled with Mr. Benfield this controversy about forged signatures?" As these questions violated the Court's motion in limine ruling precluding reference to other legal disputes involving Plaintiff, the Court sustained Plaintiff's objection.

   3.   *March 17, 2010 (and thereafter) - Questions about the "Dali Affidavit"*

Plaintiff asserts that all defense counsel utilized a prejudicial method of communicating inadmissible information to the jury by either reading from, or paraphrasing, the so-called "Dali affidavit," a document that was never admitted. By doing so, Plaintiff contends that defense counsel repeatedly kept the affidavit's inadmissible contents before the jury. For example, on March 17, 2010, Payton asked Shapiro in cross-examination:

> Q. Did you yesterday testify about the fact that you did not believe the Dali affidavit wherein he disavows the Albaretto Collection because you believed he was coerced into signing it?[3]

> * * *

> Q. But it's the artist who did these works, saying that the Albaretto Collection is not real. Whatever – and not in those exact words, but he's disavowing any authenticity of the Albaretto Collection. You don't think that your customers should know that the artist himself made that statement?

Again, on March 24, 2010, while cross-examining Cyril Boisson, Payton asked:

---

[3]Plaintiff further argues:

> When counsel paraphrased the affidavit, the problem became even more troublesome. The affidavit essentially says, "the Albarettos are not expert authenticators" not that "the works in the collection are fake/not signed by Dali." Thus, Defense counsel was not simply putting *inadmissible* evidence in front of the jury – they were putting *false* evidence before the jury, knowing that Park West would not introduce the affidavit itself.

> Q. . . . were you aware, sir, that Salvador Dali had notarized, had a notarized affidavit or it was prepared in 1987 that disavowed the Albaretto Collection and anything about the Albarettos?

Plaintiff asserts that this tactic (communicating the contents of inadmissible documents to the jurors) was used so frequently that it made it virtually impossible for the jurors to recall what information was conveyed to them in the form of counsel's questions, and what was conveyed to them by the witness's answers, even with the Court's instructions that anything attorneys say is not evidence. Moreover, the Court agrees that the frequent use of this tactic likely had the effect of confusing the jurors into believing that the information communicated through the repeated statements of defense counsel had been admitted as evidence.

As discussed in Section V.B.10 below, this type of questioning is improper and did, in fact, put inadmissible information in front of the jury.

### 4.     *March 17, 2010 - Reference to Criminal Investigations; Improper Remarks*

Payton also asked Shapiro: "Wasn't it about this time though that the German police had confiscated some Albaretto works claiming they were fake?" Upon Plaintiff's objection, the Court stated: "And I was very clear that the prior orders are going to be obeyed. I am sustaining the objection. The jury is to disregard the question. Let's continue." After the jury had been dismissed for the day, the Court stated:

> Mr. Payton, we are having some difficulty with, as I understand it, your understanding of my orders. I gave you a warning yesterday with respect to referring to any criminal matters. You again today mentioned that. This is the second time it's happened. I believe it's intentional. And you are violating a direct order of the court. And I am warning you for the second and last time that if it happens again there are going to be some serious problems. I'm telling Mr. Schwartz, you should be prepared to take over the defense of this case if this happens again.

> In addition to that, Mr. Payton you keep making extraneous remarks after you receive an answer to a question. You are making these remarks inappropriately. We just have no place for that in a court such as this. I am going to ask you again, I am going to ask you to stop doing that. I am also going to ask you to permit the witness to complete an answer before you start another question.

Plaintiff asserts, and the Court agrees, that by asking the question about the German police, Payton managed to convey to the jury that German police had confiscated certain forged artwork from the same source Park West obtained a portion of its Dali art. Moreover, by asking the question and eliciting an objection from Plaintiff, it is likely that the jury perceived Plaintiff as trying to hide information, even though Plaintiff appropriately objected to Payton's violation of one of the Court's in limine orders.

5.  *March 19, 2010 - Reference to Other Legal Disputes Involving Plaintiff*

On cross-examination, Payton asked Albert Scaglione ("Scaglione"), Plaintiff's owner, "Did you have any problems with Mr. Perez [an artist] during the time that he was under contract to Park West?" and "What was the basis for the problem you had with Mr. Perez?" The Court sustained Plaintiff's objection that those questions violated the Court's in limine ruling regarding other legal disputes involving Plaintiff. The Court finds that these questions also unfairly prejudiced Plaintiff because Plaintiff again was, in Plaintiff's words, "forced [] to appear to the jury as the party hiding information - despite the fact that it was FAR that was violating a court order." The Court notes that the type of misconduct discussed in this section and the previous section (Section V.B.5) occurred with regularity during the trial, not just on the occasions discussed herein.

6.  *March 19, 2010 - Attempt to Introduce Media Reports*

During his cross-examination of Scaglione, Payton also tried to introduce proposed

Exhibit 514, a six-page article written by Phillips entitled "Fake Prints," in the following

manner:

> [Question by Payton]: Okay. Let me show you what's been
> marked as plaintiff's exhibit 514. And if you, ask you if you, if
> this was an article you believe first talked about the fact that Fine
> Art Registry is claiming that Park West Art, the prints were fake,
> sorry.
>
> A. The question again, sir?
>
> Q. Is that the article where they talk about fake prints?
>
> A. That is an article that says fake prints, yes.
>
> Q. Have you seen that?
>
> A. I have just seen it now.
>
> Q. Have you seen it before?
>
> * * *
>
> A. I have seen it before, yes.
>
> Q. Now, this article although it is - -Your honor, I move for this
> admission.
>
> MR. YOUNG: Your honor, 514 flies directly in the face of
> this Court's rulings on several levels. I cannot imagine that
> counsel does not recognize that motion in limine eight and your
> ruling of yesterday.
>
> MR. PAYTON: Your Honor, I will withdraw that.
>
> THE COURT: All right.

Payton then proposed admitting the first page, or even just the heading, of the article. Plaintiff

objected, and Payton offered to redact the article. At that time, the Court indicated that this

could be dealt with at a later time.  Proposed Exhibit 514 was not offered again, in whole or in part.

Plaintiff argues that, as a result of Payton's conduct, the jury again got the impression that Plaintiff was trying to prevent the jury from seeing information that appeared to be relevant on the issue of whether Plaintiff was involved with fake or forged artwork.  The Court is not convinced that Payton's attempt to introduce proposed Exhibit 514 involved a deliberate attempt to improperly influence the jury.  Accordingly, the Court does not rely on this instance in evaluating whether Plaintiff is entitled to a new trial as a result of defense misconduct.

7.      *March 22, 2010 - Warnings about Improper Remarks*

Outside the presence of the jury, the Court stated to Payton:

> Mr. Payton, I counseled you before about the manner in which you have been handling this case and I am afraid I have to counsel you again.  You continue to make improper, inflammatory remarks during the course of this trial.  I asked both counsel to read the civility principles.  You keep commenting on what a witness has testified to.  And these remarks are improper and I am going to ask you again to stop them.  You made a remark to brother counsel when he made an objection in front of the jury.  You said you asked him if he is testifying now.  After a witness has made a response you made the remarks that you would be surprised to the witness.  You made a remark to the witness that you don't understand.  You talked about a crack team of research.  All of these, in my opinion, sir, are improper.  I am going to ask you to make a specific effort not to do this again.

As the Court did on the third day of trial (also outside the presence of the jury), the Court was compelled, less than a week later, to advise Payton to cease interjecting extraneous comments and opinions into the record.  As with asking improper questions, this form of misconduct had the probability of influencing the jury.

8.      *March 23, 2010 - Reference to Other Legal Disputes Involving Plaintiff*

During the continued cross-examination of Scaglione, Payton asked, "You did sue Mr. Hunter, Mr. Fields' associate, correct?"  The Court sustained Plaintiff's objection because it violated the Court's order precluding reference to other legal disputes involving Plaintiff.  The Court finds that this question: (1) clearly focused the jury on the fact that Plaintiff was involved in other litigation, and (2) alerted the jury that Plaintiff had commenced the lawsuit in question, thereby painting Plaintiff as a litigious party that sued persons who did or said things Plaintiff disliked.  The question, and its effect on the jury, epitomized the basis for the Court's ruling that evidence of other legal disputes was prohibited, *i.e.*, that the potential relevance of other disputes was "substantially outweighed by the danger of unfair prejudice."

9.      *March 23, 2010 - Reference to Television Clips*

During his cross-examination of Albert Molina ("Molina"), Jonathan Schwartz ("Schwartz"), co-counsel for the FAR Defendants, asked Molina whether a television story by Mike Hofeld, a Florida reporter, was related to a story about Plaintiff.  After Plaintiff objected, Schwartz said he would withdraw the question.  Plaintiff's counsel responded "We would prefer that he tell us the question, your Honor.  I don't want him to withdraw it."  Schwartz then asked, "what was Mike Hofeld's writing about"?  Plaintiff objected again and the Court sustained the objection.  Plaintiff contends that because Mike Hofeld previously was a television news reporter in Michigan before moving to Florida, there was an added air of credibility to the news story that Schwartz impermissibly communicated to the jury.

The Court finds that both of Schwartz's questions violated one of the Court's in limine

orders. These transgressions, however, were comparatively insignificant to much of the other misconduct committed by Schwartz, as described below. In itself, this question was not critical or influential enough for the Court to take action. In conjunction with the other misconduct attributable to Schwartz, Payton and Franks, however, Plaintiff's response to the questions again gave the appearance that it was trying to hide information from the jury. As the Court had issued an in limine order that certain information was inadmissible (in this instance, a media report), it was unfairly prejudicial for Plaintiff to have to repeatedly object to attempts to introduce such information.

> 10.      *March 29, 2010 - Reading into Evidence Non-Admitted Documents*

Ian Simpson ("Simpson"), Hochman's counsel, posed the following question to Robert Wittman, one of Plaintiff's witnesses:

> Okay. Do you recall reading Mr. Sabater's letter of July 30th, 2009 where he said, I should emphasize for you the fact that since I began working for Mr. Salvador Dali in 1968 until the first days of January 1981, I never saw Dali signing Divine Comedy series anywhere in the world. Do you remember - -

Plaintiff's counsel then objected that the document had not been admitted. The Court sustained the objection, stating: "You may ask him if he's heard that statement. But to read it from a document that has not been admitted is improper." Plaintiff asserts that Simpson continued to do this on numerous occasions, but Plaintiff cites only two such occasions when Simpson did so (both of which pertained to the Dali affidavit that Plaintiff allowed Simpson to read in its entirety during his opening statement). Plaintiff also cites multiple occasions when counsel for the FAR Defendants engaged in this practice.

Plaintiff asserts that the "damage done when the contents of documents are read to the

17

jury whether the document is admitted or not, cannot be measured.  Numerous 'bells' were already rung before any objection could conceivably be lodged."  The Court agrees.  As these questions reflect, defense counsel, especially Schwartz, frequently engaged in the practice of front-loading his questions with "facts" that witnesses would not have been allowed to testify about if proper questioning and methods of introducing evidence had been utilized.  By, in essence, backdooring information to the jury by including the information in their questions, defense counsel (again, especially Schwartz) was able to improperly influence the jury and unfairly prejudice Plaintiff.

11. *March 29, 2010 - Franks Testifies that Material Is Being Kept from Jury*

Plaintiff argues that Franks repeatedly told the jury that important material was being kept from them, *i.e.*, she told the jury that they were not being told the "whole story."  On March 29, 2010, the following colloquy transpired between Plaintiff's counsel and Franks:

> [BY MR. YOUNG]: We are not going to read the whole article.
> I want to know if there is anything - -
>
> [FRANKS]: I would like to read the entire article so the jury has
> an idea of exactly what this litigation update is about.  That's
> what I would like to do.  Because you tend to take it out of
> context, Mr. Young, and have since the beginning of this trial.
> You have taken bits and pieces of what you want this jury to hear
> and you expect me to comment on it and I just, quite honestly I
> think that's unfair to me.  I think there is a lot more in this
> article that the jury needs to know about. And even from the
> beginning of this case in 2007.

The Court agrees that Franks' complaints that Plaintiff's counsel was taking things "out of context" and giving the jury only "bits and pieces" are indicative of how she repeatedly attempted to prejudice the jury regarding rulings Plaintiff had appropriately obtained from this Court.  As discussed below, there were many other times (both when she was called by

Plaintiff and by her own counsel) that Franks' testimony went far beyond what was appropriate or acceptable. On those occasions (as she did when giving the above answer, particularly when she stated "Because you tend to take it out of context, Mr. Young, and have since the beginning of this trial"), Franks testified repeatedly that Plaintiff was hiding something when, in fact, Plaintiff simply was ensuring that the Court's orders were not ignored and/or deliberately violated.

12.    *March 29, 2010 - Reference to Other Legal Disputes Involving Plaintiff*

During Young's cross-examination of Franks, Franks mentioned "the Florida litigation" on three occasions and stated that "[t]here is a very deep investigation going on which started in '07 prior to this post. Would you like me to go into that, sir?" The jury was dismissed for the day immediately after Franks' statement about the "very deep investigation." The Court then addressed the issue of Franks' references to the Florida litigation and the "very deep investigation," as follows:

> THE COURT:  . . .  You may be seated, ma'am.  What is the Florida litigation?
>
> * * *
>
> MR. YOUNG:  Something that should be excluded, your Honor, that [Franks] intentionally brought up for the purpose of trying to bring it to the jury's attention.
>
> THE COURT:  This is three times that that has been brought up. And what is the investigation that your client is talking about?
>
> MR. PAYTON:  That's the problem.  I mean, there is a criminal investigation.
>
> THE COURT: <u>That is the problem.  I specifically ruled on this. You are again, your side is purposely putting this in evidence before this jury.</u>  And I'm going to tell you one more time.  That

19

> if there are any further violations of my orders, I'm going to
> strike your pleadings. And then the Plaintiff can have a default
> judgment. I am not going to sit here and watch my orders be
> violated. And they are being violated. So you better have a
> conversation with your client over the evening hours. I am not
> going to put up with this.

The next morning, before the jury was brought in, the Court revisited Franks' testimony:

> THE COURT: Before we begin with the jury I want to reiterate
> what I said yesterday about what this court perceives to be a
> violation of its court orders especially the orders in limine.
>
> Yesterday, this witness, Ms. Franks, mentioned some
> Florida lawsuit on three occasions and also mentioned some
> investigation. This is a direct violation of my order in limine. I
> believe that these violations are intentional.
>
> In addition to that the attorneys for the defense are
> ignoring my evidentiary rulings and acting in my opinion with
> disrespect toward the Court. When I make an evidentiary ruling
> they seem to ask the same question over and totally ignore it.
>
> This is all going to stop. And as I indicated, I believe that
> these violations are intentional and I have no reason, I don't
> know why they are. I never had a case like this where this is
> going on but this is my belief. I have been on the bench thirty-
> two years and I have never seen anything like this.

As the foregoing comments of the Court reflect, Franks (like her counsel) deliberately and

intentionally[5] violated orders of the Court in order to get certain information before the jury.

It was and remains clear to the Court that Franks' persistently improper testimony was not

the result of an accident but rather reflected a calculated ploy by Franks to get otherwise

inadmissible information before the jury. Such actions are inexcusable and, more importantly

---

[5]Franks mentioned the Florida litigation three separate times while testifying. Moreover, on at least two of the occasions that she did so, she noticeably spoke much more quickly in order to get the "in the Florida litigation" part of her answer out of her mouth and on the record.

for purposes of deciding the instant motion, had the effect of improperly influencing the jury in a manner that was unfairly prejudicial to Plaintiff.

13.    *March 30, 2010 - Franks Again Testifies that Material Is Being Kept from Jury*

Plaintiff asserts that on March 30, 2010, Franks:  (1) continued to trumpet her theme of telling the jury that "they were not seeing everything," (2) suggested that Plaintiff was "hiding the truth" from them, (3) violated Court orders not to refer to *orders* in limine or investigations, and (4) criticized the Court-ordered redaction of documents:

> BY MR. YOUNG:  All right.  Ms. Franks, you've never recanted any of these statements, have you?

> * * *

> A:    Recanted, no.  Again, I have to say, I have to qualify this, Mr. Young.  These statements weren't made by themselves.  There is much more to it.  You saw the redactions that <u>you</u> made to these documents.  So, and you don't include the whole - - you have to look at the whole picture.  It's kind of like looking at a painting on wall and seeing one corner and asking someone to buy it.  They want to unveil the whole thing and see the whole picture to get a good idea.  Were these statements made and posted on the site within a post?  Yes.

> BY MR. YOUNG:  I am not talking about DMA.

> A:    That's what I am talking about here, though, Mr. Young.  If you put up all DMA's posting, he is a victim of Park West Gallery.  That's who I'm talking about and that would explain the post.  That is what I'm talking about when I told the jury they are not seeing everything.  <u>You are cloaking it.  You are covering up things that they should see in order to get the bigger picture.</u>  And why I was - - yes, I was writing with attitude there but there was a reason for.  Mr. DMA here, if you could pull up those posts and we can read through them I can answer your question.

> * * *

21

**BY MR YOUNG:  Did you write this, ma'am?**

A:      With all due respect, Mr. Young, the first page is completely redacted.  Page two is completely missing because of the redaction, and the only part left of this five page article is one tiny little paragraph.  So, did I write it?  I don't know.  I can't see it.

Q:      Madame, that was redacted at the order of this Court, wasn't it?

A:      I have not read all the orders of the motions in limine.

Q:      You are not implying that we redacted this to hide something from the jury, are you?

A:      Do you want me to answer that truthfully?

Q:      I certainly do want you to answer it truthfully because I can assure you - -

A:      I am afraid to answer that question, Mr. Young.

Q:      Let me assure you, madame this was done at the order of the court.  We had nothing to do with the ultimate power to order documents being redacted.

* * *

**BY MR. YOUNG:   Are you proud of that language?**

A:      I think it's absolutely true.  * * * . . . I am proud of what we have done.  We have done an amazing - - Fine Art Registry has done an amazing investigation into this.

As to part (3), the Court notes that Plaintiff's counsel asked Franks the question about redactions ordered by the Court before she said anything about orders in limine.  Franks'

22

answer was responsive to the question asked and was not prejudicial to Plaintiff, nor did the answer have an improper influence on the jury. Likewise, the only investigation Franks referred to during this questioning involved the fact that FAR conducted an investigation; the fact that FAR conducted an investigation was not the subject of any motion in limine, nor did the Court prohibit any reference to the fact that FAR conducted an investigation in any of the Court's orders or rulings. The Court also finds no evidence in the foregoing testimony where Franks criticized the Court's orders.

The Court does find, however, that Franks' answers during the above-cited exchange wholly inappropriately and deliberately: "(1) continued to trumpet her theme of telling the jury that 'they were not seeing everything,' [and] (2) suggested that Plaintiff was 'hiding the truth' from them [the jury]" during this questioning. Franks clearly was less focused on testifying about admissible evidence than she was intent on portraying Plaintiff in a negative light before the jury. In doing so, Franks' testimony contributed significantly to the pervasive misconduct on the part of the case presented by the FAR Defendants, which resulted in unfair prejudice to Plaintiff.

14. *"FAR Counsel's Repeated Improper Questioning and Sanction"*

Plaintiff asserts that when FAR began its case-in-chief, its counsel posed questions that were "unbelievably objectionable - particularly because the same kinds of improper questions were posed repeatedly." Plaintiff references approximately seven instances when this type of questioning transpired, then claims that such practice "ultimately led this Court to sanction FAR's counsel" and cites the following trial transcript:

> [BY MR. SCHWARTZ]: What did Royal Caribbean do
> when you reported the activities at Park West?

23

MR. YOUNG: Objection, your Honor. Hearsay and it's become so common I respectfully request the Court for a sanction against Mr. Schwartz.

THE COURT: Sustained.

Contrary to Plaintiff's interpretation of the foregoing ruling by the Court, the Court did not sanction Schwartz on the basis of that question or any questioning of that witness (the Court did sanction Schwartz and his law firm for two questions he asked later that day, as discussed in Section V.C. below). The question does, however, epitomize the overall questioning technique of Schwartz in this case, a technique which far too often injected non-admissible information into the record. Moreover, even when asked appropriately, many of his questions called for hearsay answers and, as such, were appropriately objected to under the Federal Rules of Evidence. For example, Schwartz asked the following questions on April 15, 2010, the same day as, and immediately preceding, the question about Royal Carribean set forth earlier in this section:

A. On re-direct examination of Richard English during FAR's case-in-chief, Schwartz asked: "Okay. Now were you aware that the signatures on your prints are the exact crude forgeries that are on the Sharon Day set?" After Plaintiff counsel's objection, Schwartz indicated that he would strike the question and was done with the witness. The Court then stated: "The jury should disregard that question. Please let's not have any questions like that anymore, counsel."

B. On direct examination of Samantha Algar, a short-term customer service representative for Royal Carribean, during FAR's case-in-chief, Schwartz tried three different times to ask the witness about art work that was sold to "the Hendersons." Each time, Plaintiff objected to the question based on hearsay, and the Court sustained the objection. After the first attempt, which simply called for a hearsay answer, Schwartz asked: "Did the Hendersons have a problem with the art work that they were sold by Park West?" and "They didn't call you because they liked the art work and nothing was wrong." Shortly thereafter, Schwartz then

24

asked the question about Royal Carribean set forth above.

Once again, the Court finds that this method of questioning did, in fact, improperly and regularly put inadmissible information before the jury. The Court also finds that such information tended to influence the jury in a way that was highly and unfairly prejudicial to Plaintiff.

15. *Failure by FAR's Counsel to Control Logan Franks*

Plaintiff cites the intentional physical contact made by Logan Franks, the husband of Theresa Franks and an owner of FAR, with Young as the fifteenth example of the pervasive misconduct of defense counsel and Defendants. Following the incident, the Court reviewed video of the incident, concluded that Logan Franks made intentional physical contact with Young and barred Logan Franks from the courtroom for the duration of the trial. Although neither of these events transpired in front of the jury, the jury immediately noticed that Logan Franks was absent from the courtroom, as evidenced by one of the first questions the jurors asked the undersigned after the trial: "Where was/what happened to Logan Franks?" As Logan Franks was in the courtroom for every minute of trial prior to the incident, and had sat at counsel table as an owner and party representative for FAR, his absence was significant. In fact, notwithstanding the inexplicable and wholly unacceptable nature of Logan Franks' actions in a U.S. District Court courtroom, the juror sentiment, at least prior to rendering the verdict and talking to the undersigned, appeared to favor Logan Franks and FAR because of his absence.

16. *April 9, 2010 - Reference to Other Legal Disputes by a FAR Witness*

During Schwartz's direct examination of Martha Szostak ("Szostak"), Szostak stated

that she learned about FAR from a website that "talked about class action suits and complaints." As Plaintiff asserts, the Court finds that this statement: (1) exposed the jury to FAR's involvement with a class action suit against Plaintiff, and (2) forced Plaintiff to again object to a violation of an in limine order by the FAR Defendants, in this case by a witness they called. As such, once again Plaintiff appeared to be hiding information and evidence from the jury, even though its objections were appropriate and it was the FAR Defendants who were in violation of orders of the Court.

Accordingly, once the jury had been dismissed for the day, the Court addressed this significant violation as follows (emphasis added):

> THE COURT: We have a couple more defense issues that we need to take up. It seems that that is what I'm doing most of my time. First of all, this last witness, Mrs. Szostak, mentioned class action lawsuits in violation of a Court Order. I want to know what we are going to do about this?

> MR. SCHWARTZ: Your Honor, if I could add, Mrs. Szostak was specifically instructed not to say that. * * * I would hate to see my clients penalized for something they had no control over.

> THE COURT: Somebody had some control over this. I thought we had an order in place and I was advised by Mr. Payton that he had advised people ad nauseam, I think that's the word he used, that this was a subject matter was not to be touched on because it was a subject matter of a prior court record. Now we get here, again and it happens again.

> MR. SCHWARTZ: Your Honor, Mrs. Szostak was explicitly told not to do that. I think it was totally unintentional. My sincere apologies. And I didn't elicit that kind of testimony.

> THE COURT: What do we do about it?

> MR. SCHWARTZ: Your Honor, if I could suggest an instruction to the jury possibly to disregard the testimony. I

don't know that they picked up on it.  I tried to move on.

THE COURT: There was an objection to it.

MR. YOUNG: Your Honor, I was going to bring that up to the Court.  A lay witness gets on the witness stand who has never been on the witness stand before and blurts pas[t] a question and used a technical word like class action.  It is obvious to us that these witnesses are being locked and loaded to spit this out and to talk past questioned.  And I share the Court's concern.  There is no excuse for this.  And I don't know who is instructing these witnesses and who is locking them and loading them but somebody is doing it.

\* \* \*

THE COURT: What are we going to do about it?  Now its out in the courtroom.

\* \* \*

MR. PAYTON: . . . She has never been on the witness stand before. \* \* \* I don't think she connected up with the fact that we told her - -

THE COURT: It doesn't matter if she connected it up or not, if she read it or made it up, whatever it is.  And <u>I have instructed you that if you put a witness on, you are taking this risk.  And if the witness talked about things that are prohibited it's going to be a consequence on the defendant.  There is a risk when you put somebody on and it this happens and it has happened then there is a problem.</u>

MR. PAYTON:  I understand that, your Honor.

THE COURT: I know you understand that. \* \* \* My question is what do we do about it?

\* \* \*

THE COURT: Let's think about it over the weekend.  I want counsel for the plaintiff to tell me what they want to do.  I want counsel for the defense to tell me what they want to do and

> Mr. Young, I want your team to keep track of how many of these
> instances we have . . . .

The next trial day, prior the jury being brought into the courtroom, Plaintiff's counsel reported that there had been nine violations of the Court's rulings on motions in limine (as of that time). The Court then cautioned counsel for th FAR Defendants: "If it happens again . . . maybe ten strikes is enough."

      17.    *April 14, 2010 - Franks' Violation of Orders/Repeated Comments that Materials Were Withheld from Jury*

When cross-examined by Plaintiff's counsel upon being called as a witness during FAR's case-in-chief, Franks continued to testify that "she was forbidden from telling the jury everything that she had discovered about [Plaintiff,]" as follows (emphasis added):

> [BY MR. YOUNG]: Do you have any more evidence today than you did the last time you were on the witness stand . . .
>
> A.      As a matter of fact, I do.
>
> Q.      What is it, madame?
>
> A.      All right. Since I can't show any of the evidence we did in the past on our investigation of Rembrandt plates, Mr. Shapiro who brought in a Rembrandt plate to show the jury . . . .
>
>                 * * *
>
> [BY MR. YOUNG:] We are here today, ma'am, to determine whether you have any evidence that anybody produce[d] more than 2500 [Rembrandt plates], and I submit the answer is no. Would you agree with that?
>
> A: No. I don't agree at all. Not at all. If I were to show you the evidence and jury were presented with the evidence I have, I think they would come to the same conclusion, Mr. Young. They have not even seen a scintilla of the evidence that we have.

    **[BY MR. YOUNG]: Ma'am, I am assuming that after everything you heard in this courtroom, you still maintain that everything you, Mr. Phillips, farandaway and Fine Art Registry said about Park West is true. Do I have that right?**

    **A:    It's without a doubt, and so much more truth that this jury has not heard. So much more.**

Franks' testimony on this day exemplified the nature of the FAR Defendants' approach to trying this case. They tried to put as much information before the jury as possible (whether it was admissible or not as offered) and, at the same time, they sought to indicate to the jury that Plaintiff was trying to hide information from the jury. While doing so, they had absolutely no concern about complying with many of: (1) the rules and orders that govern the proceedings of the Court, generally, or (2) the Court's rulings that were specific to this case.

## C. Other Misconduct

    Plaintiff also identifies misconduct it believes: (1) occurred during Defendants' opening statements, (2) was reflected in the Court's imposition of sanctions against counsel for the FAR Defendants, and (3) transpired in relation to post-verdict jury activities. Together with the misconduct identified in Section V.B., Plaintiff contends that these instances of misconduct contributed to the proceedings being so influenced by prejudice or bias as to require a new trial.

### 1. Opening Statements

    Plaintiff first focuses on the fact that Payton mentioned 15 newspapers and television stations that had written articles or aired shows about Plaintiff's art cruises. When Plaintiff objected, Payton stated that he was referencing such media outlets to establish "notice that

[others besides Defendants] have written stories about [Plaintiff.]" On that basis, the Court allowed Payton to continue. Plaintiff insists that reading this laundry list poisoned the jury against Plaintiff, especially as the jury was looking for more information about the media reports and the "Park West abuses" referenced by FAR counsel. Despite Payton being unable to admit any such media reports, Plaintiff maintains that it was Plaintiff who suffered the stigma in the jury's eyes each time Plaintiff had to object to FAR's reference to such media reports. Although the Court agrees that Plaintiff suffered the stigma in the jury's eyes each time Plaintiff had to object to such reports during testimony (as discussed herein) and that the reading of the media reports was improper in light of the manner in which the FAR Defendants subsequently attempted to introduce them, the Court is not persuaded that Plaintiff was unfairly prejudiced by Payton's reference to the media reports during his opening statements.

Plaintiff also challenges Simpson's reference to the "Dali affidavit" and Simpson's promise that the Dali affidavit would be introduced into evidence. The Dali affidavit was a document that Simpson (and subsequently FAR counsel) represented was an English translation of a notarized Spanish affidavit, allegedly signed by Salvador Dali, wherein Dali disavowed the Albarettos, one of three primary sources of Plaintiff's Dali artwork. Plaintiff suggests that Simpson's promise to admit the Dali affidavit also poisoned the jurors against Plaintiff, such that Plaintiff looked like it was trying to "hide" evidence every time Plaintiff objected to the Dali affidavit. The Court addresses this matter in more detail in Section V.E. below.

## 2.     *Sanction of Counsel for the FAR Defendants*

On April 16, 2010, the Court sanctioned Schwartz and the law firm that employed him (*i.e.*, counsel for the FAR Defendants).  The Court's sanctions were predicated on questioning of Sharon Day ("Day") conducted by Schwartz on April 15, 2010, the previous day of trial:

> [QUESTION BY SCHWARTZ]:  Are you aware that if Park West wins this trial, Fine Art Registry is done?
>
> THE COURT: Wait a minute.  Wait a minute.
>
> [MS. JAYE QUADROZZI, co-counsel for Plaintiff]: Objection.
>
> THE COURT: That is totally, totally inadmissible and it's inexcusable.
>
> MR. SCHWARTZ: I apologize.
>
> THE COURT: The jury is to disregard that question totally.
>
> * * *
>
> MR. SCHWARTZ: Ms. Day, what would you think if Fine Art Registry went out of business?
>
> MS. QUADROZZI: Objection, your Honor.
>
> THE COURT: You are violating my orders, counsel.  You are violating my orders.

Before the jury was brought into the courtroom on April 16, 2010, the Court explained the basis for the sanctions, as follows:

> THE COURT:  This is, of course, not the first time I have had difficulties with defense counsel and it's a very, very unfortunate situation.  I was telling a colleague the other day, when I started this case I thought it was going to be a very pleasant experience. * * * And it turned out to be this total disaster that we are dealing with today.  And its basically on the part of the defense.  As I pointed out. They are refusing to honor the decisions that I have made.  They are refusing to abide by the rules that I have made

31

regarding the motions in limine.  I still have Mr. Young's ten or twelve page violations, I'm still considering what to do with that.  And in no way what I'm going to do now has anything to do that.  I'm reserving the right to take additional action on that.

But it seems to me that this action is intentional.  I just can't believe it is unintentional.  To ask this kind of a question and get it before the jury is just totally unacceptable.  I've give[n] the jury a curative instruction but I don't know how they can ignore this.  I mean, it's just totally, totally inappropriate.

I am going to give the defense one more benefit of the doubt.  I am imposing a fine on Mr. Schwartz and his law firm in the amount of $5,000.  That is to be paid by Monday . . . .  I don't know what else can go wrong.  Now we have had a plaintiff's attorney assaulted.  I have had to remove somebody from the courtroom.  So, it's at your peril, Mr. Payton, as to what you want to do with Mr. Schwartz.  Anymore - - any further violations, all I can say is that the consequences will be extremely severe.

3.    *Jury Activities*

After the verdict was read, the Court stated to all persons still in the courtroom (*i.e.*, everyone present for the reading of the verdict, except the jurors) that "interviewing of . . . jurors in this courthouse" is not permitted and that "I don't want anybody pestering or talking to these jurors."  Plaintiff asserts that, based on a post-trial video produced by Franks and broadcast on the FAR website, two jurors "waited for Ms. Franks to leave the courtroom, at which time she spoke at length with these jurors and permitted them to 'autograph' one of her trial exhibit boards."  Plaintiff thus believes, after having watched the videos, that Defendants were successful in their "attempt to 'sway' the jurors with [Franks'] 'story' and her attempt to 'get the truth out there'."

Although the conversation between those jurors, Franks and counsel for the FAR Defendants technically violates the directive of the Court not to talk to the jurors, the Court shall not rely on any post-verdict misconduct in deciding Plaintiff's motion for a new trial. First, and most significantly, the jury was not privy to any post-verdict activity when deciding this case and rendering its verdict. Second, the jurors: (a) initiated the conversation, (b) clearly desired to talk to Franks, and (c) likely would have contacted FAR, Franks and/or counsel for the FAR Defendants anyway.

**D.    New Trial Warranted on Claims Against the FAR Defendants and Counter-claims by FAR and Phillips**

Contrary to the FAR Defendants' response, the trial in this case did not involve "a few insignificant violations of this [C]ourt's limine orders by defense counsel and/or a couple of their witnesses[.]" The foregoing statement by the FAR Defendants ignores the many admonitions of Franks and/or counsel for the FAR Defendants by the Court throughout the trial. Moreover, many of the Court's admonitions were not made only one time. Rather, as is evident from many of the admonitions, the Court repeatedly admonished Franks and/or counsel for the FAR Defendants because they had disregarded prior warnings and/or orders of the Court. The many admonitions by the Court included the following:

1.    On March 16, 2010 (the <u>second</u> day of trial), after Payton asked whether a person at a Park West event was from the FBI, the Court said to Payton, "I am not going to touch on this subject again except to say that if it's brought up in this forum or any other forum[,] there are going to be some serious consequences."

2.    On March 17, 2010 (the <u>third</u> day of trial), after Payton asked about an investigation by German police, the Court stated:

**Mr. Payton, we are having some difficulty with, as I understand it, your understanding of my orders.  I gave you a warning yesterday with respect to referring to any criminal matters.  You again today mentioned that.  This is the second time it's happened.  I believe it's intentional.  And you are violating a direct order of the court.  And I am warning you for the second and last time** that if it happens again there are going to be some serious problems.  I'm telling Mr. Schwartz, you should be prepared to take over the defense of this case if this happens again.

3.      On March 22, 2010 (the <u>sixth</u> day of trial), the Court "counseled" Payton for a

second time regarding extraneous remarks Payton uttered following responses by witnesses:

**Mr. Payton, I counseled you before about the manner in which you have been handling this case and I am afraid I have to counsel you again.  You continue to make improper, inflammatory remarks during the course of this trial.**  I asked both counsel to read the civility principles.  You keep commenting on what a witness has testified to.  And these remarks are improper and I am going to ask you again to stop them.   You made a remark to brother counsel when he made an objection in front of the jury.  You said you asked him if he is testifying now.   After a witness has made a response you made the remarks that you would be surprised to the witness.  You made a remark to the witness that you don't understand.  You talked about a crack team of research.  All of these, in my opinion, sir, are improper.  I am going to ask you to make a specific effort not to do this again.

4.      On March 29, 2010 (the <u>eleventh</u> day of trial), at the close of testimony for the

day, the Court stated:

THE COURT:  . . .  You may be seated, ma'am.  What is the Florida litigation?

\* \* \*

MR. YOUNG:  Something that should be excluded, your Honor, that she [Franks'] intentionally brought up for the purpose of trying to bring it to the jury's attention.

THE COURT:  <u>This is three times that that has been brought up</u>.  And what is the investigation that your client [Franks'] is talking about?

MR. PAYTON:  That's the problem.  I mean, there is a criminal investigation.

THE COURT: <u>That is the problem.  I specifically ruled on this. You are again, your side is purposely putting this in evidence before this jury.  And I'm going to tell you one more time.  That if there are any further violations of my orders, I'm going to strike your pleadings.  And then the Plaintiff can have a default judgment.  I am not going to sit here and watch my orders be violated.  And they are being violated.</u>  So you better have a conversation with your client over the evening hours.  I am not going to put up with this.

5.      On March 30, 2010, before the jury was brought in for <u>twelfth</u> day of trial, the

Court stated:

<u>Before we begin with the jury I want to reiterate what I said yesterday about what this court perceives to be a violation of its court orders especially the orders in limine.</u>

* * *

<u>In addition to that the attorneys for the defense are ignoring my evidentiary rulings and acting in my opinion with disrespect toward the Court.  When I make an evidentiary ruling they seem to ask the same question over and totally ignore it.</u>

6.      On April 9, 2010 (the <u>twentieth</u> day of trial), after Szostak testified about class

action suits and complaints against Plaintiff, the Court stated:

THE COURT: <u>We have a couple more defense issues that we need to take up.  It seems that that is what I'm doing most of my time.</u>   First of all, this last witness, Mrs. Szostak, mentioned class action lawsuits in violation of a Court Order.  I want to know what we are going to do about this?

* * *

MR. PAYTON: . . . She has never been on the witness stand before. * * * I don't think she connected up with the fact that we told her - -

THE COURT: It doesn't matter if she connected it up or not, if she read it or made it up, whatever it is. And I have instructed you that if you put a witness on, you are taking this risk. And if the witness talked about things that are prohibited it's going to be a consequence on the defendant. There is a risk when you put somebody on and it this happens and it has happened then there is a problem.

7. On April 12, 2010 (the next trial morning, the <u>twenty-first</u> day of trial), the Court told FAR's counsel, "If it [a violation of one of the Court's motions in limine] happens again . . . maybe ten strikes is enough."

8. On April 15, 2010 (the <u>twenty-fourth</u> day of trial), the Court made the following pointed rulings and comments regarding the wholly inappropriate questioning conducted by Schwartz as to the viability of FAR in the event Plaintiff prevailed at trial:

[QUESTION BY SCHWARTZ]: Are you aware that if Park West wins this trial, Fine Art Registry is done?

THE COURT: Wait a minute. Wait a minute.

* * *

THE COURT: That is totally, totally inadmissible and it's inexcusable.

* * *

THE COURT: The jury is to disregard that question totally.

* * *

MR. SCHWARTZ: Ms. Day, what would you think if Fine Art Registry went out of business?

* * *

**THE COURT:** You are violating my orders, counsel. You are violating my orders.

9.     On April 16, 2010 (before the jury was brought in for the <u>twenty-fifth</u> day of trial), the Court stated:

> <u>This is, of course, not the first time I have will difficulties with defense counsel and it's a very, very unfortunate situation.</u> I was telling a colleague the other day, when I started this case I thought it was going to be a very pleasant experience. * * * And it turned out to be this total disaster that we are dealing with today. <u>And its basically on the part of the defense. As I pointed out. They are refusing to honor the decisions that I have made. They are refusing to abide by the rules that I have made regarding the motions in limine.</u> I still have Mr. Young's ten or twelve page violations, I'm still considering what to do with that. And in no way what I'm going to do now has anything to do that. I'm reserving the right to take additional action on that.
>
> <u>But it seems to me that this action is intentional. I just can't believe it is unintentional. To ask this kind of a question and get it before the jury is just totally unacceptable. I've give[n] the jury a curative instruction but I don't know how they can ignore this. I mean, it's just totally, totally inappropriate.</u>
>
> I am going to give the defense one more benefit of the doubt. * * * So, it's at your peril, Mr. Payton, as to what you want to do with Mr. Schwartz. <u>Anymore - - any further violations, all I can say is that the consequences will be extremely severe.</u>

To summarize, during the course of the trial, the Court threatened to: (a) impose "serious consequences"; (b) remove lead counsel for the FAR Defendants from the case; (c) strike pleadings and enter default judgment for Plaintiff; (d) implicitly, enter judgment for Plaintiff upon another violation of a motion in limine order because "ten strikes is enough"; and (e) impose "consequences [that] will be extremely severe." Furthermore, on March 30, 2010, which was the twelfth day of trial (*i.e.*, approximately halfway through the evidence

37

presented in this case),[6] the Court stated:

> This is all going to stop.  And as I indicated, I believe that these violations [of my orders in limine] are intentional and I have no reason, I don't know why they are.  **I never had a case like this where this is going on but this is my belief.  I have been on the bench thirty-two years and I have never seen anything like this.**

As the foregoing admonitions reveal, the Court: (1) found the transgressions of Franks, FAR counsel and one of FAR's witnesses to be egregious and, in most cases, deliberate and intentional, **and** (2) communicated to all counsel and parties exactly how significant, inappropriate and inexcusable the Court considered the misconduct of Franks and counsel for the FAR Defendants to be.

Accordingly, the FAR Defendants' response that there were but "a few insignificant violations of this [C]ourt's limine orders by defense counsel and/or a couple of their witnesses" is: (1) disingenuous, (2) misplaced, and (3) not supported by the record.  Their response is also wholly consistent with, and ironically reflective of, the approach Franks and counsel for the FAR Defendants employed in trying this case, *i.e.*, without respect for or conformance with the rulings and orders of the Court.

Notwithstanding all of the unfairly prejudicial misconduct of Franks and counsel for the FAR Defendants during the course of the trial, the Court did not remove FAR's lead counsel, strike the pleadings of or enter default judgment against any Defendant or impose any consequences against Franks, FAR, Phillips, Payton or Schwartz (other than the imposition of monetary sanctions against counsel for the FAR Defendants).  In other words, the Court did

---

[6] Incredibly, as exemplified by: (a) parts 5-8 of this Section V.D., (b) parts 13-17 of Section V.B., and (c) part 2 of Section V.C., Franks and counsel for the FAR Defendants not only continued to engage in such deliberate, intentional and highly and unfairly prejudicial conduct, the severity of their transgressions actually increased following the Court's March 30, 2010, comments and admonitions.

not take any action that it threatened or which could have inhibited the FAR Defendants' ability to defend the claims against them and/or prosecute their counter-claims. On April 16, 2010 (the last full day of testimony), however, the Court expressly stated that it was "reserving the right to take additional action on" the multitude of orders in limine violations committed by Defendants, defense counsel and their witnesses.

After reviewing: (1) the case file (including the pre-trial Opinions and Orders issued by the Court, including the orders pertaining to the 27 motions in limine filed in this case, and in excess of 250 pages of handwritten notes taken down by the undersigned during trial), (2) the post-trial motions and briefs filed by the parties, (3) the transcripts of trial testimony, and (4) many cases where a court ruled on the propriety of granting a new trial on the basis of misconduct by counsel and/or party(ies), the Court concludes that additional action is necessary to ensure the fair administration of justice in this case. As set forth above, the misconduct of Franks and counsel for the FAR Defendants was egregious, frequent and ongoing. Their misconduct permeated the entire trial. The misconduct commenced with Payton's cross-examination of the first witness and it continued up to Schwartz's questioning of Day on the twenty-fourth day of trial, and, unfortunately, occurred with regularity during trial, including on both occasions that Franks testified.

In considering whether to take additional action and, ultimately, to grant Plaintiff a new trial, the Court has reviewed and considered all of the factors set forth in *Peter Kiewit, supra,* at Section V.A. Specifically, the Court finds:

a.    <u>Nature of the comments</u>. As discussed above, the comments and actions of Franks and counsel for the FAR Defendants were deliberate, intentional and calculated to

improperly get inadmissible information before the jury for the purpose of unfairly prejudicing the jury against Plaintiff.

b. **Frequency of the comments**. The comments and actions occurred frequently, repeatedly, consistently and throughout the course of the trial, such that the effect of their misconduct was that there was never an opportunity for the jury to escape, forget or overlook the misconduct. In other words, as noted above, the misconduct permeated the trial and, although many severe examples are set forth in this Opinion, there were many, many more violations of the orders in limine and the rules of evidence during the trial.

c. **Possible relevancy to the real issues before the jury**. In this case, the misconduct of Franks and counsel for the FAR Defendants was calculated to be, and was, directly relevant to the real issues before the jury, namely the credibility and reputation of Plaintiff, whom the FAR Defendants (and Hochman) had accused of engaging in fraudulent activity.

d. **Manner in which the parties and the Court treated the comments**. As discussed above, Franks and counsel for the FAR Defendants cavalierly made the comments and engaged in the actions which constituted the offensive misconduct. In their post-trial brief, they have exhibited the same attitude and approach, wherein they still suggest that there were but "a few insignificant violations of this [C]ourt's limine orders by defense counsel and/or a couple of their witnesses . . ." despite:

(i)     hearing the Court's repeated admonitions of how inappropriately the FAR Defendants and their counsel were trying the case, including the repeated violations of orders of the Court;

(ii)    hearing the Court state: "I have been on the bench thirty-two years and I have never seen anything like this"; and

(iii)   having an opportunity to see (virtually) all of their transgressions,

(virtually) all of the Court's comments about their misconduct, and (virtually) all of the admonitions that the Court made regarding their misconduct.

Unlike the FAR Defendants, Plaintiff treated the misconduct seriously and with a recognition of the gravity of the unfair prejudice such misconduct was having as the trial unfolded. With admonitions and warnings to Franks and counsel for the FAR Defendants, the Court repeatedly tried to redirect Franks and counsel for the FAR Defendants to present a proper case to the jury, *i.e.*, one that was not riddled with misconduct that was unfairly prejudicial to Plaintiff.

e. <u>Strength of the case</u>. The Court believes that this is a case that, if fairly presented, is one that would cause the finders of fact to grapple with and debate. The fact that the jury deliberated for approximately two full days in spite of the unfairly prejudicial misconduct of Franks and counsel for the FAR Defendants reflects the closeness of this case.

f. <u>The verdict itself</u>. The Court finds that the verdict rendered by the jury must be discounted because of the misconduct of Franks and counsel for the FAR Defendants. The Court believes their misconduct and their injection of inadmissible evidence into the record so obfuscated the admissible evidence introduced at trial that it is likely that the jury's decision was based, at least in part, on such improper, inflammatory and unfairly prejudicial information rather than solely on the admissible evidence.

Accordingly, for the reasons set forth above and based on the totality of the circumstances involved in this case, the Court concludes that there was at least a "reasonable probability that the verdict of [the] jury [was] influenced by" misconduct of Franks and counsel for the FAR Defendants. *Twachtman*, 106 F.2d at 509. Their misconduct, as detailed

41

above, taken in the aggregate, demonstrates repeated violations of orders of the Court, the rules of evidence and the rules of trial practice. In short, the misconduct reflected a lack of respect for both this Court and for the trial proceedings that are designed to ensure a fair trial to all parties. More significantly, for purposes of determining whether a new trial should be granted, the Court finds that Franks and counsel for the FAR Defendants engaged in a "deliberate course of conduct aimed at preventing a fair and impartial jury[,]" and that such misconduct: (1) deflected the jury's attention from the issues involved, (2) caused unfair prejudice to Plaintiff, and (3) had a controlling influence on the jury. *Wilson*, 183 Mich. App. at 26 (citation omitted). In addition, the Court finds that Plaintiff has made " a concrete showing that the misconduct of counsel [and Franks and Szostak] consistently permeated the entire trial from beginning to end[.]" *Sutkiewicz*, 110 F.3d at 361 (citation omitted). The Court thus concludes that there was a reasonable probability that a fair and impartial jury no longer existed by the time it commenced deliberations and, accordingly, that a fair verdict was not rendered in this case. The Court therefore grants Plaintiff's motion for a new trial with respect to Plaintiff's nine claims against the FAR Defendants and the Lanham Act counter-claim asserted by FAR against Plaintiff.

E.    New Trial Not Warranted on Claims Against Hochman

The Court is not persuaded that the totality of the circumstances involved in this case support the granting of a new trial with respect to Plaintiff's claims against Hochman. First, the only instance of Hochman's alleged misconduct cited by Plaintiff (and the Court's notes reflect no other possible misconduct) involved Hochman's testimony when questioned by Schwartz after Plaintiff called Hochman as an adverse witness. Plaintiff argues that Hochman

testified in violation of the Court's order precluding reference to criminal investigations when Hochman stated: "There's a lot of civil actions against them [Plaintiff]. There's investigations. I am told there is a federal investigation underway. I hope it goes through." The record reflects, however, that at the time Hochman made those statements, he and Schwartz were, at Schwartz's direction, reading into the record questions asked by Phillips (being read by Schwartz) and the answers Hochman gave during a 2007 interview of Hochman conducted by Phillips. That interview was then published in written form on the FAR website on November 6, 2007. The statements of Hochman set forth above, as read into the record, constituted his verbatim recitation of a portion of that article. Prior to Hochman's testimony, however, that article had been offered by Plaintiff, without redaction, as Exhibit 507 and the Court had already received into evidence, without redaction, Exhibit 507. The Court also notes that Plaintiff did not object to the reading of those statements prior to Hochman uttering them, nor did Plaintiff object once Hochman had read the answers into the record. Thus, the Court finds that this testimony by Hochman did not constitute misconduct.

Second, the misconduct of Hochman's counsel (Simpson) did not rise to a level that would permit the Court to, solely on the basis of the actions of Simpson, find that there was "a reasonable probability that the verdict of [the] jury [was] influenced by [Simpson's] conduct." *Twachtman*, 106 F.2d at 509. The central focus of Plaintiff's argument that Hochman engaged in misconduct is that Hochman read from documents that had not been admitted, a practice the Court ruled was improper:

> [THE COURT]: You may ask him if he's heard that statement.
> But to read it from a document that has not been admitted is
> improper.

Plaintiff asserts that Simpson continued to do this on numerous occasions, though Plaintiff cites only three such occasions (including the initial occasion when the Court issued the ruling quoted above). Plaintiff believes these occasions, together with the many instances where counsel for FAR did the same thing, had an immeasurable negative impact on Plaintiff ("the damage done when the contents of documents are read to the jury whether the document is admitted or not, cannot be measured. Numerous 'bells' were already rung before any objection could conceivably be lodged."). As reflected by the quote above, the Court agrees that Simpson attempted to put certain evidence before the jury in an improper manner.

Plaintiff also alleges that the following actions attributable to Simpson constituted misconduct: (a) in his opening statement, Simpson said that the Dali affidavit would be admitted as an exhibit, and (b) Simpson made an inappropriate objection during the testimony of Bernard Ewell ("Ewell") on direct examination. The Court, however, finds that neither of these actions constituted misconduct that resulted in prejudice to Plaintiff.

First, when Simpson represented in his opening statement that he would be introducing something as evidence (the Dali affidavit) and failed to do so, Hochman was the party harmed by Simpson's failure to get that evidence introduced. Moreover, based on the pre-trial motions and filings, the Court also finds that Simpson probably had little reason to doubt the admissibility of the Dali affidavit when the trial commenced, even though the exhibit ultimately was not admitted. For example, there was no motion in limine to exclude reference to it, even though Plaintiff had filed almost 20 motions in limine. Likewise, Plaintiff did not object when Simpson discussed the Dali affidavit during his opening statement, even when Simpson read the English translation of the Dali affidavit to the jury. In an ordinary case, the

Court might be inclined to find that Plaintiff's failure to object was based on the long-held tradition of not interrupting opposing counsel's opening statements and closing arguments. In this case, however, Plaintiff had not hesitated to object during Payton's opening statement, which was given before Simpson's.

With respect to the objection made by Simpson during Ewell's testimony, the Court finds that: (1) at least in front of the jury, Simpson did nothing improper except make an erroneous objection, (2) nothing inappropriate was communicated to the jury in conjunction with his objection, and (3) Plaintiff was not prejudiced as a result of the objection. Therefore, based on the limited instances of misconduct by Simpson, the Court concludes that his misconduct did not have the effect of unfairly prejudicing or influencing the jury.

Plaintiff next argues that, even if the misconduct of Simpson was not prejudicial in itself, Hochman "profited from the prejudice" injected into the case by the misconduct of Franks and counsel for the FAR Defendants, such that Plaintiff should also be entitled to a new trial on its claims against Hochman. In support of its argument, Plaintiff relies on *LaMade v. Wilson*, 512 F.2d 1348 (D.C. Cir. 1975). In *LaMade*, the plaintiff brought claims against both his treating physician and the treating hospital. At trial, the physician's counsel conducted improper cross-examination of plaintiff and his physician (suggesting that plaintiff had already been compensated by a worker's compensation award). Counsel for the hospital did not engage in such questioning. The D.C. Circuit nonetheless ordered a new trial of plaintiff's claims against both the physician and the hospital, observing that "[c]ounsel for appellee Providence Hospital did not initiate the error, but it could have profited from the prejudice, so its [no cause] judgment must also be reversed." *Id.* at 1350 n.2.

The Court is not, of course, bound by the *LaMade* decision. In this case, the Court believes it is possible that Hochman could have profited from the prejudice to Plaintiff caused by the misconduct of Franks and counsel for the FAR Defendants. Based on the totality of the circumstances in this case, however, and for the following reasons, the Court declines to vacate the judgment in favor of Hochman and order a new trial on Plaintiff's claims against him.

First, contrary to Plaintiff's assertions, Hochman did not defend this case "in tandem" with the FAR Defendants. Plaintiff's decision to sue Hochman along with the FAR Defendants does not create a joint defense by the defendants. Likewise, any decision by the Court to give the Defendants an aggregate period of time for closing arguments (or by the magistrate judge to give all Defendants a fixed number of peremptory challenges) does not mean that the Defendants were trying the case in tandem. Hochman hired separate counsel, and he filed separate and distinct pre-trial motions and responses. Throughout the course of trial, Hochman consistently distanced himself from the overall activities of FAR, Franks and Phillips. For example, in the relatively limited questioning conducted on Hochman's behalf, Simpson consistently asked witnesses whether they knew who Hochman was and/or what he had written. Most of those witnesses, including both of Plaintiff's customers who testified on Plaintiff's behalf, did not who Hochman was or what he had said in the one FAR article that related to him, notwithstanding their familiarity with FAR. In most instances, Simpson asked little else of the witnesses he questioned.

Second, although the type of claims against Hochman are the same as those Plaintiff brought against the FAR Defendants (*i.e.*, defamation, tortious interference, conspiracy), the scope of activity in which Hochman was alleged to have participated was far more limited.

Unlike the extensive and ongoing internet "smear campaign" Plaintiff asserted the FAR Defendants have engaged in, the claims against Hochman stem from one interview that Hochman gave to FAR (Phillips), which FAR then published in written form on the FAR website. Accordingly, at trial, the overwhelming focus of Plaintiff's case-in-chief pertained to the activities of the FAR Defendants, not those of Hochman. Similarly, in its post-trial brief, Plaintiff attributed almost every instance of the egregious, deliberate, intentional, inflammatory and unfairly prejudicial misconduct that permeated the trial on Franks and counsel for the FAR Defendants, with only the occasional reference to Hochman and/or Simpson.[7] In other words, although Plaintiff clearly asserted in its complaint (and amended complaint) that the interview with Hochman posted on the FAR website defamed Plaintiff, it is also clear that Plaintiff primarily blames, and seeks to recover from, the FAR Defendants for the damages Plaintiff alleges it has suffered.

Accordingly, and for the reasons set forth above, the Court denies Plaintiff's motion for a new trial insofar as it relates to Plaintiff's claims against Hochman.

**F.      Arguments of the FAR Defendants Not Previously Considered**

The FAR Defendants argue that there are three reasons why Plaintiff is not entitled to a new trial.

### 1.      *Plaintiff's Failure to Move for a New Trial*

As Defendants correctly state, Plaintiff did not move for a new trial at any time prior

---

[7]Even Plaintiff's reply brief, obviously filed after Hochman filed his response brief, makes no reference to any misconduct by Hochman and says very little about any alleged misconduct involving Simpson. As in its initial brief, and notwithstanding the fact that Hochman's response expressly exposed the absence in Plaintiff's initial brief of much misconduct attributable to Hochman and/or Simpson, Plaintiff's reply almost exclusively cited the misconduct of Franks, Payton and Schwartz.

to the verdict. There is, however, no governing law that requires this Court to find that Plaintiff waived its right to request a new trial because it did not move for a mistrial prior to the jury verdict. Neither the U.S. Supreme Court nor the Sixth Circuit has ruled on the issue. *See Clarksville-Montgomery Cty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1003 n.20 (6th Cir. 1991) ("Because we hold that the district court did not abuse its discretion in denying the motion for new trial, we need not reach the waiver issue"). In this case, Plaintiff retained competent, experienced trial counsel, and the Court shall afford Plaintiff's counsel the benefit of the doubt that Plaintiff's counsel had a reasonable basis for not requesting a mistrial prior to the jury verdict. As such, the Court shall not substitute its judgment for that of Plaintiff's counsel.

### 2. *Failure to Object and/or Request Curative Instructions*

As Defendants accurately state, Plaintiff did not object and/or request a curative instruction each time misconduct occurred and, in fact, Plaintiff did not object and/or request a curative instruction on numerous occasions when it could have. In some cases, a court has held that it would not reverse a verdict "where a curative instruction could have alleviated any prejudicial effect." *See, e.g., People v. Callon*, 256 Mich.App. 312, 329 (2003) (citations omitted); *People v. Unger*, 278 Mich.App. 210, 235 (2008) (citations omitted) ("Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions."). It is also true, however, that:

> cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information . . . cautionary

48

instructions would have little, if any, effect in eliminating the prejudicial harm.

*Peter Kiewit*, 624 F.2d at 759 (quoting *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977)).

In this case, the sheer volume and nature of the prejudicial statements, questions and answers expressed by Franks and counsel for the FAR Defendants obviated the possibility that giving a curative instruction in each instance would have been effective. As set forth above, the improper and objectionable conduct of Franks and counsel for the FAR Defendants was frequent, highly prejudicial and permeated the trial proceedings. Moreover, much of the misconduct involved injecting inadmissible information on critical issues before the jury. In other words, the misconduct was not isolated, or insignificant, or of a nature that could easily be cured. On several occasions when the Court asked Plaintiff what it wanted to do about the violations, Plaintiff indicated that it did not want the Court to give a curative instruction because doing so would have only caused the jury to re-focus on the prejudicial testimony. On each of those occasions, the Court agreed that giving a curative instruction would have prejudiced Plaintiff even more than the original utterance did, standing alone. Accordingly, the Court concludes that Plaintiff's failure to object and/or request a curative instruction does not constitute a sufficient basis for the Court to deny Plaintiff's motion for a new trial as it pertains to the FAR Defendants.

3.    *Plaintiff's Violations of Orders in Limine*

The FAR Defendants assert that Plaintiff violated the Court's orders pertaining to the motions in limine on seven occasions.

In the first incident, Plaintiff sought to introduce an exhibit that should have been redacted prior to be offered because it contained references to a CBS broadcast about Plaintiff. In a light most favorable to the FAR Defendants, the Court finds that Plaintiff violated one of the Court's rulings on one of the motions in limine when it sought to introduce an exhibit before properly redacting the references to the CBS broadcast. At the time Plaintiff offered the exhibit, however, the jury was not prejudiced in any way because Plaintiff did not mention the CBS broadcast or display the exhibit to the jury in a manner such that the jury could see the references to the CBS broadcast (*e.g.*, by projecting portions of the exhibit on the court screen). Ironically, however, Payton managed to prejudice the jury against Plaintiff when making his objection. Rather than simply objecting that the exhibit contained material that should have been redacted, Payton stated "the problem is the CBS broadcast is mentioned in a number of these ..." Thus, even on this occasion, when Plaintiff technically violated one of the Court's rulings, Payton trumped Plaintiff's violation by: (a) also violating a ruling of the Court, and (b) improperly communicating to the jury that CBS had broadcast a story about Plaintiff.

As to the second incident, Young asked Scaglione: "[H]as anybody ever demonstrated in your 40 year history that any of the art that you have sold to anybody is not authentic or so-called, to use the defendant's lawyer's word, fake?" (to which Scaglione answered, without objection, "In 40 years, not once") and "Have you ever been accused of selling fake art?" (to which Scaglione answered, "By our defendants. By our defendants."). At this point, Payton objected because he believed this line of questioning and/or the answers would go into lawsuits by other parties against Plaintiff. Young then withdrew the second question. The Court finds

that these questions did not violate any ruling on a motion in limine because the questions asked and the answers given did not make any reference to lawsuits.

In the third incident, Young asked Scaglione: "[H]ave you ever been involved in any kind of organized crime?" and "[H]as anyone at Park West that you know of been involved in organized crime?" Contrary to the contention of the FAR Defendants, these questions did not violate the Court's ruling on the motion in limine regarding reference to criminal investigations (Docket #189), or any other motion in limine. In the fourth incident, Scaglione recited the lines from something that had been posted on the FAR website, as follows: "Park West certainly has a sweet set-up with cruise lines, don't they? Together they are raking it in and laughing all the way to the bank. If Interpol and the FBI Art Crime Unit * * * don't have their respective radar up on this one, they certainly should. This one has organized crime written all over it." As the Court stated on the record, this statement did not violate any of the Court's rulings.

In the next alleged violation, Young asked one of Plaintiff's customers (not Molina, as the FAR Defendants' brief indicates): "Do you believe that [Scaglione] would defraud purchasers by selling them fake art?" Upon objection by the Defendants, the Court stated that Young had not laid a foundation for the question. Young then moved on to a different topic. Although the question was improper because a foundation had not been laid, it did not communicate an answer to the jury, nor did it include inadmissible evidence. Moreover, the question did not violate any ruling by the Court on any motion in limine (including the Court's ruling on the motion in limine pertaining to Wittman - presumably the one the FAR Defendants believe Young violated).

As to the sixth incident, in a light most favorable to the FAR Defendants, the FAR Defendants are correct in pointing out that Plaintiff violated one of the Court's orders when Plaintiff introduced Exhibit 341 without redacting certain inadmissible information. During Payton's re-direct examination of Phillips, Schwartz asked Plaintiff to put a certain portion of Exhibit 341 on the screen for the jury to see. When Plaintiff put the requested portion of Exhibit 341 onto the screen, the Court immediately observed that some of the displayed language should have been redacted before being shown to the jury. The offending language was "This is the link regarding Fine Art Registry and its owner defaulting on the Lawsuit." The Court finds that this violation did not prejudice FAR or Franks because: (a) it is highly unlikely that any of the jurors saw the offending language in the few seconds it was on the screen, and (2) the offending language was not read into the record. In addition, even if all of the jurors read that statement, the Court finds that the meaning of the language was unclear. The Court also notes that, if Plaintiff intended to get this information before the jury, Plaintiff could have projected the language on the screen when cross-examining Phillips about Exhibit 341. Instead, Plaintiff projected the language onto the screen only when counsel for the FAR Defendants requested that a certain portion of Exhibit 341 be put on the screen.

The FAR Defendants also claim Plaintiff violated one of the Court's rulings on a motion in limine when Quadrozzi asked Day: "Are you aware that Sotheby's has been prosecuted by the United States Federal Government?" The Defendants objected to this question, Quadrozzi responded and the Court stated, "Let's move on to another question." The Court did not rule expressly on the objection at the time, but the Court now concludes that the question did not violate any ruling by the Court.

After considering each of the seven alleged violations by Plaintiff and finding that Plaintiff committed two violations,[8] the Court concludes that those two violations were extremely insignificant in the context of the entirety this trial. Simply put, the impact of those two violations was less than negligible in light of the pervasive misconduct of Franks and counsel for the FAR Defendants.

## F.    Conclusion

For the reasons set forth above, the Court concludes that the misconduct of Franks and counsel for the FAR Defendants was pervasive, offensive and significant, to such an extent that the Court holds that there is a "reasonable probability that the verdict of [the] jury [was] influenced by such conduct." Accordingly, the Court: (1) vacates the jury's verdict with respect to the nine claims asserted by Plaintiff against the FAR Defendants, (2) vacates the jury's verdict on the Lanham Act counter-claim filed by FAR against Plaintiff, and (3) orders a new trial on the nine claims asserted by Plaintiff against the FAR Defendants and the Lanham Act counter-claim filed by FAR against Plaintiff.

As discussed above, however, no new trial shall be had on Plaintiff's three claims against Hochman, and the verdict entered in Hochman's favor on Plaintiff's three claims against him shall stand. Moreover, as no motion has been filed with respect to the six non-Lanham Act counter-claims filed by FAR and Phillips against Plaintiff, the verdict entered in Plaintiff's favor on the six non-Lanham Act counter-claims filed by FAR and Phillips also shall

---

[8]In its reply brief, Plaintiff argues that Plaintiff's "counsel allegedly violated [only] orders in limine that [Plaintiff] *had procured for its own benefit*!" (emphasis in Plaintiff's reply brief). Contrary to Plaintiff's position, the Court finds that the fact that a party procured the Court's rulings on a motion in limine is wholly and completely irrelevant and immaterial on the issue of whether the Court's order has been violated. A party does not have *carte blanche* to proceed at its whim (or, more specifically, in violation of a ruling by the Court) simply because that party filed the motion that triggered the Court's ruling.

stand.

In addition, as a result of the Court's rulings set forth above, the Court **DENIES AS MOOT** the following motions and requests:

 1. **Bill of Costs filed by the FAR Defendants and Bill of Costs - Amended, filed by the FAR Defendants (Docket #s 345 and 355);**

 2. **Motion for Determination that Judgment is Not Final or Imposition of Stay, filed by Plaintiff (Docket #346);**

 3. **Motion for Attorney Fees and Treble Damages, filed by FAR (Docket #349); and**

 4. **Renewed Motion for Directed Verdict, filed by Hochman (Docket #353).**

The Court also notes that Hochman has filed a Bill of Costs (Docket #354), to which Plaintiff has filed a response. The Court hereby **ORDERS** Hochman to file a reply to Plaintiff's response on or before August 27, 2010.

Finally, inasmuch as Plaintiff did not request that the Court award costs for fees and expenses incurred for the 28 days of trial, no costs shall be awarded.

## VI. CONCLUSION

Accordingly, and for the reasons set forth above, Plaintiff's JMOL Motion (Docket #338) is **DENIED** insofar as Plaintiff seeks a judgment as a matter of law and **GRANTED IN PART** and **DENIED IN PART** insofar as Plaintiff seeks a new trial.

In furtherance of the rulings herein, the Court hereby **STRIKES** the Judgments previously entered in this matter (Docket #s 341 and 342). In striking Docket #s 341 and 342 and rendering this Opinion and Order, however, the Court **ORDERS** that the jury verdicts rendered in favor of: (a) Hochman, with respect to the three claims Plaintiff filed against him,

and (b) Plaintiff, with respect to the six non-Lanham Act counter-claims filed by FAR and Phillips, shall remain intact.

In addition, the Court hereby ORDERS Hochman to reply to Plaintiff's response to Hochman's Bill of Cost request on or before August 27, 2010.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  August 12, 2010

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on August 12, 2010.

S/Marie E. Verlinde
Case Manager
(810) 984-3290